Good morning, everyone. It's nice to be back in person and see so many lawyers in the courtroom. Our first case up this morning is 21-2242, 21-2251, and 21-2666, United States v. Chanu and Vorley. Mr. Mazur, good morning. Good morning, Your Honor. Good morning, and may it please the Court. My name is Matthew Mazur, and I am counsel for Appellant Vorley. I've agreed with Appellant Chanu that I will be some time to address something that comes up individually. We'll split our time on rebuttal. Okay, that's fine. I'd like to begin, if I could, with three things that this Court has said about the Wire Fraud Statute. It has warned in the first instance about expansive interpretations of the Wire Fraud Statute that could be used to criminalize broad swaths of conduct, particularly in the business context, and would pose due process and fair notice concerns if it were interpreted so broadly. The second thing is that it has explained that not everything that could be described as deceptive or dishonest is wire fraud. And the third thing, in United States v. Dial, which is a case that involves futures trading like this one, the Court said that posting the required margin, and I'm quoting now, gives a misleading signal because it is not backed by any cash. And the Court also said this is because the trader hadn't traded with the knowledge that he'd, quote, have to put his money where his mouth is. The government prosecuted Mr. Chanu and Mr. Vorley on a very different theory, and one that has never been endorsed by this Court or any other. It's the theory that every bid or offer on an anonymous futures exchange, like COMEX, impliedly represents that the trader has the good faith intent to trade, meaning in the government's view that they actually desire to trade the futures contracts, to buy or sell. And the theory is that even if, as this Court said in Dial, the trader is backing it up with cash, is willing to put his money where his mouth is, that the order is somehow fake or false if the trader hopes to be able to cancel the order. That expansive theory, as I said, has never been endorsed by any court, and it would... Wasn't it endorsed in the commodities fraud statute under COSIA in this Court? Yeah, so in COSIA, the Court specifically said it wasn't addressing the issue of false statements or material omissions because in that statute they weren't required. But the theory of that being a fraud and a scheme to defraud was certainly endorsed there. The Court certainly said that COSIA violated the commodities fraud statute, which requires a scheme to defraud. That is different than the conduct in this case, however. This is charged... Wire fraud is charged here, I understand. Right. But you made a fraud scheme, and it seems to me that we did endorse that in COSIA. What I was saying is no court has endorsed the implied representation of good faith theory that the government based its case on here, right? So it made the deliberate choice to try this case, and the jury was instructed that there needs to be a false statement or material omission in this case, recognizing maybe that they blew the statute of limitations and couldn't prosecute commodities fraud. But let me just address COSIA directly because it's obviously an important case. The conduct in COSIA could not be more different than the conduct here. COSIA is about a trader who commissioned a computer programmer to develop a high-speed spoofing algorithm that was capable of canceling orders within milliseconds if they risked being hit, and in the words of this court, created a totally non-existent market. None of that happened here. But that's a fact. It certainly goes to intent, given the algorithm that was created. But the evidence here that the government presented showed just how quickly your clients were able to manually cancel. So I don't understand why, and you've made this argument throughout your brief, why you're putting so much weight on the fact that it was done manually rather than through a computer algorithm, given how quickly your clients were able to do it manually and significantly, which is the point that the government made at trial, only 0.2% of your spoofing orders were actually filled, compared to the 0.8% under the computer program, which is pretty close. Well, so I think if you looked at overall, 95-99% of all orders in this market are canceled. If you looked at the screen here, it's flickering back and forth. Most of it is dominated by computer algorithms, and the reason why it's important is because a manual trader, even if he were to quickly press his mouse twice, place an order, and cancel it, he could not hope to be able to beat the speed of computer algorithms that could trade in milliseconds. Again, it may be faster under an algorithm, but it doesn't seem like that is dispositive, again, especially given the evidence of how quickly your clients were able to do it manually, and the low percentage of orders that were actually filled. I guess what I'm saying is it's not that quick in this market, even though we can describe it as quickly as human beings. In this market, it's actually not that quick, but it goes back to what I was saying about Dial to answer the question that I think you're getting at. Orders that are entered and canceled manually are 100% at risk, whereas Kosha designed his program so that, yeah, maybe some of them happen to get executed, but they were designed to not be at risk. He didn't have the intention of putting his money where his mouth is, which is where it matters. I'm sorry to interrupt. Why isn't that a fact that might be very relevant, but why isn't that a fact for the jury, rather than something that is dispositive as a matter of law on the wire fraud theory? Because the jury was instructed that there has to be a material false statement or omission, and the theory here was that it was an implied false statement. Mr. Mazur, you criticize the government's approach, obviously, and understandably from your perspective, but what's the risk with that theory that you call too expansive in this case? Well, the risk of the theory is that it's not confined to spoofing, and it's not confined to placing orders with the intent to cancel. So, for example, there are all kinds of orders that a trader might place, including a stop-loss order that they don't want to execute, they're hoping not to be executing, including an order that somebody could place intending to trade and then cancel. All these things might change supply and demand on the exchange, and the government could say, well, if you did that with bad faith, then you have, there's an implied representation of bad faith, and that is sufficient for wire fraud, and it would enable basically any rule violation, any violation of the spoofing statute, any market manipulation scheme to be prosecuted as a wire fraud. I mean, Congress passed a law against spoofing and said the maximum penalty is 10 years, and in this case, the government says, well, we don't have to worry about that. We'll go back even before Dodd-Frank became effective, and we'll use the wire fraud statute affecting the financial institution and it's a maximum penalty of 30 years, and the statute of limitations is 10 years. I want you to, if you could, be a little more specific about what the chill on the market that you suggest. Yes, I mean, so traders, I think maybe I could give a little context in this market. I mean, there are human beings trading large amounts for banks on behalf of customers, buying and selling gold and silver, and then there are hedge funds with computer algorithms that trade at lightning speed, and the government's expert in this case says it's a game of cat-and-mouse between the large institutional traders who have big orders and the hedge funds with computers who are trying to front-run those orders. And for that reason, COMEX allows all kinds of different trading that could be described as deceptive, right? It allows trading on both sides. It allows trading anonymously. It allows invisible trading. It allows hidden quantity trading, all of which affect the way the order book looks, and they do that because if they didn't, if you weren't allowed to hide what your true desires are and what your true intentions are, the supercomputers would simply eat the lunch of the human beings and no human being would trade in this market. Deception of some kind is required to make the futures markets work. Is there a difference between hiding what your true intentions are, which is par for the course here in this setting, and intentionally driving a price up or down, which is what the government's theory seems to be about the manipulation happening here. Right, so I would say two things about that. One is there really is no difference if you change the shape of the order book by hiding supplier demand, meaning you can make it look like there's 20 times more supply than there is demand by hiding or by placing a visible order. And it's sort of ironic that the 100% visible order here is what's being viewed as deceptive, as opposed to the hidden quantity order in which somebody actually wants to buy or sell 100 lots and hides 99 of them. That's considered not deceptive somehow. So I think it's really six in one, half a dozen of the other. But to answer your question about moving prices, right, there is a, you know, maybe this is prosecutable under a market manipulation statute. In that case they'd have to prove that there was a creation of an artificial price, that, you know, that what was fair market value and were they trying to trade at above or below fair market value. There was no effort to do that here. There was no evidence about what actual fair market value is here. So it's not wire fraud just because you are engaged in trading that is designed to move prices. So I would say both of those things, that there's just all kinds of orders that can be placed here that anybody could call deceptive that are a fundamental part of what this market is and make it work, frankly. And, you know, the that if you were willing to put your money where your mouth is, that that was a real order. It wasn't fake. You know, Congress can pass a law against spoofing. Congress can pass a law and say you're not allowed to place orders for the purpose of moving a price. That would all be fine. It doesn't mean that the government can use the general wire fraud statute in order to prosecute that involved trading before Dodd-Frank and during a time when the traders were told that the rules had changed and the rules were unclear about spoofing, there was evidence that the bank told them that after all of the trading conduct, that's the basis of the convictions here, emphasizes why the court really needed to give a good-faith instruction or somehow explain to the jury that in a conduct that is arguably deceptive is permitted, that if the defendants believed that what they were doing was part of the cat-and-mouse game, was arguably like an iceberg order and permitted, not explicitly prohibited, the court had to explain to the jury, as every other court in a criminal spoofing case has, that good faith is a complete defense to wire fraud. And that was taken away from the jury in this case because they were told only that if there's a scheme to deceive for the purpose of obtaining money or property and that's what you intended and you knew what you were doing, that was sufficient to prove wire fraud. Ms. Mazur, in 2017, the United States v. Johnson, didn't we address whether or not you had to give a good-faith instruction in a wire fraud case? So the court has on multiple occasions, including Johnson, said that specific intent is the opposite of good faith and if you prove specific intent to defraud, then that necessarily precludes good faith. But this case proves, I think, that that is not true in every case. It may be true in most cases that a person who intends to deceive or cheat specifically for the purpose of property or money necessarily lacks good faith. But because you can intend to deceive on this market in good faith, you really need to explain to the jury that that's not the case if the person believes in good faith. Would you seek an obstruction along the lines that it's okay to deceive? We asked if the simply say if you were cheating for the purpose of obtaining money and property, then that would be sufficient. The problem is when you have deceive or cheat, it allows a conviction based on deception for the purpose of obtaining money and property, which the evidence shows overwhelmingly was permitted to some extent on this market. And there was evidence that the cooperating witness didn't think he was violating any rule, that people were doing this openly, and that in September 2012, the head of the Precious Metals Desk sent an email to the group saying, hey guys, the rules have changed and it's still a little bit unclear, but we need to be worried about these spoofing cases. That's after all the conduct in this case. I mean, that's the problem with going back before Dodd- Frank at a time when the rules was changing and using the wire fraud statute as if everybody, you know, was operating under the rules as they exist today after Dodd-Frank. Dodd-Frank was a big deal and changed the rules and Kosher was prosecuted after Dodd-Frank. You know, this is literally the first case where the government has prosecuted traitors under this implied representation of good faith theory for conduct before Dodd-Frank. You're into your rebuttal time, Mr. Mazur. Oh, sorry, I didn't realize how that worked. May I introduce Mr. Glazer? Good morning. Good morning. May it please the Court, William Glaser for the United States. The spoofing conduct in this case violated the wire fraud statute under the, because it was a scheme to defraud, as that term has been understood for 150 years and specifically as this court has found to be a scheme to defraud. Now, the defense has argued today that Kosher is distinguishable for essentially two reasons. First, that it involved a different statute and second, that there was a computer algorithm that conducted the canceling in that case. Neither of those distinctions, though, is sufficient for this court to reach a different conclusion here. First, the commodities fraud statute at issue in Kosher focuses on a scheme to defraud. Again, that's a term that's been in the mail fraud statute for 150 years. The Congress amended the statute to add sort of the second half of the mail fraud statute to say that it also applied to false or fraudulent misrepresentations gained, intended to obtain money or property, but the Supreme Court has subsequently explained that that didn't actually change the scope of the term scheme to defraud. It simply codified a Supreme Court decision. So that distinction doesn't matter. It's a scheme to defraud. It would be very difficult for this court to say that it's a scheme to defraud for purposes of the commodities fraud statute, but not for purposes of the similar wire fraud statute. Looking at the facts, the distinction between the computer algorithm and the manual spoofing that took place in this case, they point out that in Kosher the cancellation took place within milliseconds. However, if you look at the ten counts of conviction in this case, nine out of the ten included at least one order that was in fact canceled within milliseconds. One of them was about a third of a second. The one that had the longest period before the first cancellation was 1.397 seconds, so slightly over a second. So that also is not a distinction. The important point here is that the same conduct was conducted whether it was through a computer algorithm that was specifically designed to do the cancellation or it was done manually. Mr. Glasser, do you dispute that trading on an anonymous futures exchange like was done here involves some degree of legitimate deception? Your Honor, I think it involves deception only as to the intentions, the market intentions or negotiating position of the parties, but not deception as to the transactions that the parties are intending to engage in. What do you mean by that? Because as you know, the defendant's argument is the instruction on deception was misleading or not accurate because iceberg orders, some of the things that are allowed on the futures exchange, are deceptive by nature, legitimately so. And so including that language in the instructions, which is part of the wire front statute I understand, and not giving a good-faith instruction on the other side is problematic because it would criminalize a lot of legitimate deceptive behavior. So Your Honor, I said deceptive. I don't think deceptive is necessarily the best way to think of it. It's really concealing. It's concealing the sort of full market interest. If we're talking, for example, about the iceberg orders, it's concealing the full market interest of the parties. And this court has said in the Weimer decision that the defense cites, and that we cite as well in our brief, has said that a party needn't disclose their full negotiating positions. And so concealing, for example, that you would be willing to accept a certain price is not fraud, right? Concealing the, you know, that's what anyone engages in any barter transaction. But what's different here is that they weren't simply misrepresenting their sort of subjective desires of the prices that they were willing to take. What they were misrepresenting is essentially supply and demand. They were saying, they were placing orders, one of these orders was a number of orders that were immediately canceled before they could be executed. So the misrepresentation there is a misrepresentation not just about sort of subjective goals, but in fact a misrepresentation about the market and the transaction that the party intends to engage in. So we're not prosecuting the defendants for their subjective desires to enter into or avoid certain transactions, but we're prosecuting them for the misrepresentation that they actually intended to engage in fulfilling these orders, when in fact the orders were placed only to drive the price up or down to fill the iceberg orders on the opposite side of the buy-sell divide. And if the jury thought that some legitimate deception was permissible, and this is what they were engaged in, how could the jury have gotten that based on the instructions? Your Honor, the defense was able to argue to the jury that the government failed to prove intent to defraud for just that reason. And if you look at the district court's order denying the Rule 29 motion, this is pages 109 and 110 of the short appendix attached to the defense's brief, the district court explained there that any, this is quoting from page 109, any argument that the evidence supported an inference of good faith could easily be couched instead as an argument that the evidence showed that the defendants did not have the required intent to defraud. And in fact, the district court went on to cite some of those arguments. So as Judge Flom pointed out in the colloquy with defense counsel, intent to defraud and good faith are incompatible, and so simply omitting a good faith instruction did not prevent the defense. But what harm would there have been in the district court giving the instruction? Wouldn't it have just been extra clarification for the jury? Your Honor, it might have been harmless. The district court didn't think so. The district court thought it could be confusing, as again it explained in the order denying the Rule 29 motion. But even if it were harmless to include it, that certainly doesn't mean it's an abuse of discretion and in fact prejudicial error to have omitted it. So the question isn't really, could the district court have given it? The district courts have given that instruction in similar cases. The question is, was it an abuse of discretion not to? And this court's decisions, we cite four of them in our brief, have consistently concluded that where intent to defraud is an element of the offense, a good faith instruction is not required. It's actually de novo, though. It's not abuse of discretion. Oh, I'm sorry, Your Honor. A theory of defense instruction under this court's precedent is de novo. I apologize. In COSHA, which you've relied on heavily, they did receive a good faith instruction. What impact should that have on our ruling? Again, I don't think it should have an impact here, because although I misstated the abuse of discretion standard that applies in this circuit with respect to theory of defense, the harmless error argument is still the same. I mean, in COSHA, again, this court has not found error in the four cases that we cited. So I don't think... Although several of them aren't on appeal yet. I'm sorry, those cases, that's correct. But the four cases we cite that involved intent to defraud under the wire. Yes, yes. Not spoofing cases. Correct. Yes. So this court has not considered before a spoofing case specifically, whether a good faith instruction is required. But again, the district court's decision to include one in COSHA doesn't mean that it was error for the district court to not include one here. And in any event, the error would be harmless. The district court... The defense doesn't really challenge in this appeal whether or not the evidence was sufficient to show intent to defraud. We sort of laid that in our harmless error argument, and the district... Again, the district court in the Rule 29, order-denying Rule 29 motion laid that out very extensively. There was more than enough evidence for the jury to find intent to defraud. Mr. Glaser, would you address Mr. Mazur's argument about the chill this will have on trading? Yes, Your Honor. I don't think that there is any possible chill to the government's theory here. For one thing, some of the types of orders that he mentioned are exactly the types of orders that COSHA said were fine and were distinguishable. So COSHA, in fact, at page 800, distinguished the fill or kill and the iceberg orders that the defense has pointed to here as being legitimate and potentially chilled. And also, I think the fact that the market hasn't been sort of destroyed by Dodd-Frank is further proof that applying our theory to spoofing, as we did here... Again, we're not applying some sort of new theory. We're applying the way that the wire fraud statute has long been understood. But applying it to spoofing, in this case, is not going to have a chilling effect on the market because, in fact, the market has continued to go along just fine after Dodd-Frank. And I think it's also helpful to look at the Dial case that the defense discussed because Dial also involved trading of precious metals futures. And the defense argues that this case is different than Dial because in Dial, the issue of trading on an unmargined account was not being able to... willing to put your money where your mouth is. But I think the same could be said of the defendants in this case because their mouth was saying that they wanted to engage in these incredibly large orders of up to a quarter billion dollars when, in fact, they were not willing to put their money there, and they intended to cancel those orders immediately before they could be executed. And so, in fact, although it's not the same, obviously, as trading on an unmargined account, the same theory there that by entering an order on a futures exchange makes certain implied representations about your good faith engagement in that market, and concealing the fact in Dial that you were trading on an unmargined account, and here concealing the fact that you intended to cancel the orders before execution, that is wire fraud as this court has understood it for 30 years. A small portion of the spoofing orders were actually filled, and they carried through on those. What impact should that have? Your Honor, in Kosha, this court said that similar facts had no impact. So, admittedly, the fill rate was slightly higher here than it was on one of the exchanges at issue in Kosha, although not the other. So, in Kosha, it was 0.08%. And I think the highest fill rate in this case was over all the trading, not the 61 episodes presented at trial, was around 2%. But the same analysis applies that just because a very small proportion of them were able to be executed on, it does not mean that it wasn't fraud. In fact, the defendants in this case were more successful in filling their large orders, the orders they intended to fill, than was the defendant in Kosha. So, only about 35% of the large orders he wanted to fill were filled, whereas here, the numbers were closer to 80% for the defendants. So, again, Kosha distinguished that argument. Can you address the Speedy Trial Act argument? Was there any discussion of the ends of justice at any point before the district court denied the motion to dismiss? No, Your Honor, there wasn't. Although the reasons presented to the district court for allowing the defense to delay filing further pretrial motions until the resolution of the big motion to dismiss, those reasons were the types of reasons a court would consider when considering the ends of justice. But the district court did not say, I'm finding that the ends of justice justify this continuance. So they were not placed on the record until the denial of the speedy trial motion to dismiss. But the Supreme Court has said that as long as the district court has made the ends of justice calculations in the court's mind at the time of granting the continuance, a subsequent articulation of those findings is permissible. And in this case, the district judge did subsequently articulate the reasons for the continuance. And the defense hasn't really disputed that there were good reasons to delay the filing of additional pretrial motions. They asked for the ability to do that. And that was the basis for the continuance. The only thing that they're really faulting the district court for here is taking too long to consider their motion to dismiss. That, as they believe, raises a strong argument under the wire fraud. What tells you that the ends of justice was in the mind of the district judge at the time that the motion was filed, at the time he was considering it, all the way up until the moment he then attempts to place a finding on the record? So, Your Honor, basically two things. First, the deaths with the district court said in the order denying the speedy trial motion to dismiss. And secondly, those were the types of reasons articulated by the defense and acceded to by the judge in granting the continuance. In other words, that it would be a waste of time to file a bunch of additional pretrial motions when the district court might, in fact, grant the big one, the motion to dismiss the indictment. So, it's true that we can't point to anything else. The district court didn't mention the ends of justice, but it did mention considerations that would apply to the ends of justice. And then the district court has said in an order, I believed that a continuance was advisable based on these considerations at the time. Did he say that, or did he say, I would have? He went beyond saying, I would have granted it. He did say, in sort of another part of the order, I would have granted it. But he did, in fact, say that the, and this is a page 54 of the short appendix that's attached to the defendant's brief. Here, I concluded at the status hearing on November 15th that an ends of justice exclusion of time was appropriate on the basis of the defendant's request to defer further pretrial motion practice until the court had ruled on the motion to dismiss. So, the court said it concluded that at the time. And later in the order, this is at page 55, the next page. Accordingly, in my view, then and now, the exclusion while the motion to dismiss was pending was appropriate under the ends of justice. So, the court has, the district court has represented that it was considering them at the time. And in fact, that comports with the facts in the record at the time the continuance was granted, although the district court didn't actually mention the ends of justice provision. If the court has no further questions, I'd be happy to yield my time. Okay, thank you. Thank you. Mr. Mazur. Mr. Mazur, may I clarify two things with you, please? Of course. First, you are not challenging the sufficiency of the evidence here, are you? We are challenging the sufficiency of the evidence on the element of the evidence. Of a false statement and material omissions, we- Are you challenging the legal? I understood your brief to be challenging the legal issue as to whether or not that's required for the wire fraud, not the sufficiency of the evidence to support that. It raises both issues. I would say that we move to dismiss the indictment. I understand you addressed it below and you addressed it in the post-trial motions. I think if you see our brief, we do raise legal insufficiency and the evidence was insufficient to show that there was a material false statement or omission. I may have you identify in your brief after the fact where you've raised a challenge to the sufficiency of the evidence. You don't have to do it now. And then I have one other question for you for clarification purposes. Below, you argued on the Speedy Trial Act, you were seeking to dismiss it both under the Speedy Trial Act itself and the Sixth Amendment. It seems like before us, you were just challenging a Speedy Trial Act violation, not claiming a Sixth Amendment violation. That's correct, Your Honor. Okay, thank you. And maybe if I could start there. At the time of the continuance on November 15th, 2018 that the government relies on, it is true that the judge agreed to decide the motion to dismiss first and defer other pretrial proceedings. He was asked specifically if there would be an exclusion of time and he pointed to the automatic exclusion, which under the statute gives him 30 days after the conclusion of all briefing to decide a motion. What wasn't in anybody's mind on November 15th, 2018 and couldn't be, was that there would be anything other than a prompt decision on the motion. The judge thought he was gonna decide this motion promptly. He ended up having under the automatic exclusions until April of 2019. So more than five months to decide a single pretrial motion and then he realized later that it was gonna be- Well, that's not exactly right because you're assuming you start ruling on a motion once the motion itself is filed and not wait for it to be fully briefed. I'm not assuming anything. The statute says that once the court takes the motion under advisement, meaning once it's fully briefed, no more than 30 days is automatically excluded. Correct. And what I'm saying never happened here is nobody said, I'm gonna need more than that 30 days. Let me consider when the interest of justice is, whether the interest of justice justifies that additional delay of six months, which happened here. And if the court were to permit this kind of sub salientia when the court was directly asked, are you gonna exclude time and didn't mention the interest of justice? And then after taking the motion under advisement simply takes as long as it takes without making any findings on the record. Presumably part of the reason is the press of other court business. I know district court judges are very busy, right? But the Speedy Trial Act says that is not a permissible basis for a continuance. It's just crystal clear from the record here. Did you ever raise that? I'm sorry to interrupt. Did you ever raise this with the court, Mr. Mazur, other than seven months after the ruling? No, we raised it in a motion to dismiss pre-trial, which is all that you have to do to preserve a Speedy Trial Act claim. But in terms of putting the court on notice, did you ever, when you had statuses, inquire, raise the fact that there's a Speedy Trial Act violation, ask for a finding? There was no status conference in between the oral argument when the judge said he was gonna rule promptly and the issuance of the opinion. But the oral argument was after the 30 days, wasn't it? No, the oral argument was before the conclusion of all briefing because the judge gave additional time for amicus briefing. So there was an oral argument, there was some additional briefing that happened, and then there was silence for six months. But there may have been amicus briefing, but the oral argument I thought itself was after the motion itself was fully briefed, not putting aside amicus. I mean, the motion response was why. Yes, the motion was fully briefed, but we have conceded that the automatic exclusion lasted until the conclusion of amicus briefing plus up to 30 days. And what's your response to the portions of the record that Mr. Glazer cites saying no, the judge did indicate at the time it was making ends of justice findings even though it didn't explicitly say that? Well, we agree that the judge made the decision to decide the motion to dismiss first because he thought it would be more efficient to do that. What we dispute is that that was sufficient under the Speedy Trial Act to be a balancing of the interests for something that happened way four months later, which is that the judge realized it was gonna take longer than he expected to rule. So even if the judge thought this is more efficient at the time, he didn't make the findings that would be required under the Speedy Trial Act even if that was what was in his mind, which we don't dispute that that was what was in his mind. What wasn't in his mind was what are the interests of the public in a speedy trial? If I take six extra months to decide this motion, what are the interests of the defendants if I decide this motion? We didn't have a chance to address that issue in front of the judge because nobody knew that was happening. The judge says I'm relying on the automatic exclusions which expire 30 days after the conclusion of all briefing. But to follow up on my colleague's question, Mr. Glazer, once you were aware that in your view that 30 days had run, whether there's a status report or not, a conference, especially in this period of time, did anything preclude you from bringing it to the attention of the court that they were in violation of the Speedy Trial Act? So the Supreme Court has said you can't even affirmatively waive a Speedy Trial Act violation. I understand. But the answer is if you are a criminal defendant who actually wants a speedy trial, there are times when a Speedy Trial Act dismissal without prejudice is actually going to result in your trial being delayed longer. However, what happened here is that when the judge took six months to decide beyond the end of all briefing, almost a year to decide this one pretrial motion, it pushed the trial into the pandemic. And our trial date was moved from March of 2020 until it ended up being September of 2020. So once that happened, we filed the motion to dismiss based on the Speedy Trial Act violation. Did you start discovery or trial preparation at all while you were waiting for the court to resolve the motion? We had certainly had discovery. We were trying to conserve resources for sure. We didn't have unlimited resources. But this statute doesn't require you to make a showing of prejudice. Absolutely not. Or to do anything other than file a motion before trial begins. Correct. And there was prejudice here being pushed into the pandemic, having a trial with masks and social distancing and a witness on video, 11 jurors after a COVID scandal. We don't have to show that. What's the earliest statement, Mr. Mazur, that could have started the trial? Well, we filed our motion to dismiss on November 15th, 2018. If it had been decided promptly in 2019, we would have had a trial in 2019 before the pandemic. Instead, it was decided on October 31st, 2019. And then there were other pre-trial proceedings. We asked for a speedy trial. We got a March date, which we thought was reasonable given the volume of discovery, March 2020. And of course, everybody knows what happened in March 2020. So at that time, it was in our interest to get a dismissal, and even if it was a dismissal without prejudice to being re-indicted. But- Okay, Mr. Mazur, thank you. I know we're way over. Thank you very much. Thank you. Of course, the court will take the case under advisement.